So now if my colleagues are ready we'll proceed to the next case involving the Town of Redington Beach. Is Mr. Eschenfelder with us? Yes, Your Honor. All right. We'll be happy to hear from you. Thank you, Your Honors. May I please report, Robert Eschenfelder representing the Town of Redington Beach. In this particular case, I want to start with the lower court's voiding of the town's customary use ordinance pursuant to its interpretation of Florida Statute 163-035. As my briefing papers indicated, the federal courts, whenever they're interpreting a Florida law, will use Florida's statutory interpretation rules, which include that the court has to give effect to all the words of a particular statute. You can't read out of a statute any of the particular words. So the plaintiffs in this case, as to this argument, rely on subsection two of the statute, which states that a customary use ordinance that is adopted will be required to be based upon a judicial declaration. The town relies on subsection four of the statute, which allows customary use to be raised by an affirmative defense for pre-July 1st, 2018 ordinances. And apparently the lower court just simply agreed with the argument of plaintiffs in this matter that the statute, the fact of the statute is that when it came into effect on July 1, 2018, simply wiped out any and all customary use ordinances that hadn't been adopted pursuant to the complex judicial process that the new statute promulgated. But as I argue in the brief, your honors, that ruling and that theory completely reads out the affirmative defense that the legislature clearly provided municipalities and counties in Florida under subsection four of the statute. How do you think that works? I mean, can you just walk me through that? So subsection four says, you know, appears to say if the ordinance is adopted before July 1, 2018, as this one was, then you're good to go. But yet the earlier part of the statute says they can't remain in effect or cannot adopt or keep in effect. How do you work through that? Well, I certainly admit the town certainly admits that this statute is poorly drafted. And it wouldn't be the first poorly drafted statute that we've ever dealt with. But we have to apply the rules of construction and we have to give effect to sub four. And so, as I argued in my brief, the best way to do that is that one way of gaining a judicial declaration is by having the ability to raise the affirmative defense provided for in subsection four. So how it would work is that, obviously, everyone who hadn't adopted a customary use ordinance as of July 1, 2018, you just have to do that process that's included in the statute where you sue each and every parcel owner and so forth in state court. For our category of ordinance that between 2016 and 2018 ordinance, it seems very clear to me that you wait for a challenge, as what occurred in this case. And once a challenge comes in a court, be it a state court or a federal court, you have the opportunity to raise customary use as an affirmative defense, and you would gain your judicial declaration in that way. Is there a mechanism to seek a judicial declaration for this type of thing under Florida law? Could a municipality go a declaratory judgment that they have the appropriate customary use? Well, I think that the statute for municipalities and counties that didn't have customary use adopted by July 1 of 2018, the process that the legislature promulgated in the statute is now the exclusive method, which is effectively like a declaratory judgment action, but has a lot more process. For the pre-July 1, 2018 ordinances, in theory, a government could do that, but as I cited in my brief, laws of Florida and ordinances of Florida's municipalities and counties carry a presumption of constitutionality. And so there is no Florida case law and no Florida statute before the adoption of 163035, which would have caused the town to file a declaratory judgment action. The town adopted a legislative ordinance recognizing the applicability of customary use to the dry sand beaches in town, and that ordinance carries a presumption of constitutionality. So there would be no need before the statute is adopted for the town to pursue a declaratory judgment. So the answer to Judge Brandt is that, yes, in theory, the town could have, but there would have been no purpose to do so. So the district court also went on and said that even if you could raise this affirmative defense, that the evidence that you submitted in support of your customary use argument was insufficient to survive summary judgment. Could you address that, whether you think that you've sufficiently put enough evidence in to establish customary use? Thank you, Your Honor. And yes, so that is the second point on our appeal. The court and the plaintiffs in this case went about a great deal of effort to argue that the town is not a tourist Mecca. Tourists don't come here. But the town's history expert that it retained, deduced in his report and the additional testimony and depositions of the folks who lived in the town for many decades, brought forth several facts. First of all, there is tourism in the town. There are vacation rentals in the town. The town has one sort of hotel, if you will. It's a condo that's been converted, basically. But by and far and away, this ordinance was adopted not to foster tourists from Canada or any place such as that, but because residents of the town who don't own beachfront property. Part of why they bought into the town was because they understood that when, you know, Grandma Bessie comes from Michigan or whatever, that we can bring her out to the beach and that we can do the traditional things that the ordinance provides for on the beach. The district court said with respect to the expert that the expert was really talking about the pre-tidewater line. So I think there's no dispute that there's public access to high tide mark. And what we're talking about is high tide mark up to sort of the seawall. The district court said that the expert was only talking about the high tide line. And so he said that we don't care what that expert says about that because that's not in dispute. What do you say about that? That passage of the expert's deposition, he wasn't, I don't think he was really understanding what he was being asked. And so I think he just repeated his understanding of what is reserved to the public and trust forever versus what is not. But the record clearly contains testimony from the mayor and from several other of the commissioners that yes, indeed, we have used the dry sand beach for the things that are put forward in the ordinance. So we understand that there are things that can occur in the wet sand. That's not really an issue in this case. Part of the problem is that the court didn't take into account the expert's assessment of the beaches outside of the actual boundaries of the town. And we believe that that is too narrow of a reading. The state appellate court Trapanier case said that it is impossible to precisely define the areas to be studied in terms of gaining proof of customary use. And in that case, in fact, noted that studying the entire coast of Florida County could be used as evidence. And so the town kind of feels that the court just missed out of hand all of the evidence that was presented because it wasn't focused just on the beach and what is now current day Reddington Beach. I don't want to interrupt you, but I know you're running out of time. Didn't Trapanier also say that the analysis was intensely local? It seems that that case, which is Florida law, which we need to follow, does set out a pretty concrete way to determine whether there's enough evidence of customary use. Well, it is. Absolutely. It's intensely local, but the court also said in that same opinion that it's impossible to precisely define the area studied. And I think that the judge, the lower court simply said, okay, this is the modern day boundaries of Reddington Beach municipality. And it's going to ignore Reddington Shores, North Reddington Beach, Madera Beach, all of which directly surround Reddington Beach within a couple miles. And that just artificially narrows the town's ability to establish customary use. And I think it's interesting that you have evidence in the record where even the plaintiffs, a couple of plaintiffs admit, yeah, I walked from my house to the restaurant in the town behind me, which is one of the things in the ordinance that's allowed. I'm out of time. I actually have a question for you that I couldn't seem to work in. So beaches are pretty important in Florida, and your constitution addresses the public right of access to beaches. Against odds, you have not one Florida judge on this panel. What would you think about certifying this question to the Florida Supreme Court? Your Honor, thank you for that question. And so here's the issue. And this is really critical, and I wish we would have had more time to argue because there's a lot of points. We will give you time and rebuttal. But the facial taking ruling is really the biggest critical thing here that the lower court did that we strongly disagree with. And the lower court did that based on the federal constitutional takings clause. As you know, Florida relies on federal takings law. And so what you'd be certifying to the Supreme Court might be the first count, which is the interpretation of the Florida statute, which arguably the lower court should have not gotten in the middle of because no Florida courts ever interpreted it. And yet the court went ahead and tried to figure out what it means. But the court found that the adoption of this ordinance, the moment it became effective, constituted a facial taking of the property. And that simply cannot square with all the Florida court rulings. You've got the Tonerama case, which in 1974, the Florida Supreme Court first recognized customary use. And the Trepannier case, which clearly ruled, and I cite the passage in my briefs, Your Honor, that if customary use is established, then that will not result in a taking. And as we know, takings is based upon Florida or the state's property law. It's not a federal issue. It's what does each state provide for is your personal property. And so I'm not sure what you would certify to go back to. Let me let me address that because I had the same question. I mean, we only get to the federal constitutional question if the ordinance is effective. Right. If the ordinance is ineffective, then there is no federal constitutional question because the ordinance is ineffective and you haven't taken anything. You haven't arguably taken anything. You pass an invalid ordinance. Isn't that right? Well, sure. And so to get to the federal constitutional question, we'd have to reverse the district court first on the state law question. Right. That's correct. Okay. So I think that's the issue that Judge Martin was asking about. Shouldn't we should we potentially certify the state law question to the Florida Supreme Court so we can decide perhaps this case on a state law issue instead of a federal law issue? What do you think about that? I think ultimately the Florida Supreme Court would be the arbiter of what that statute means. And certainly, if the court agrees with our position, then the ball would be back in your court to point a phrase to then have to parse the federal constitutional ruling that the judge made. Thank you. We'll be happy to hear from Mr. Weber. Good morning. May it please the court. My name is Timothy Weber and I'm here on behalf of the Appalachian property owners in this case. The right to exclude others from private property is one of the fundamental rights and the bundle of sticks. And that right was taken by the town when they passed an ordinance declaring that the property owners no longer had that right down to the point of mean high water on their land. And that was the taking, just like in Kaiser Aetna from the United States Supreme Court, taking away the right to exclude is really the fundamental characteristic of private property. And so that is precisely why when the town publicly enacts an ordinance that says the public has a right to this person's land and this person is prohibited from taking any action to interfere with that right, that is per se a taking. And so is it your position that, you know, people other than the owners have never used the dry sand beach beaches in Reddington? So the thing about Reddington Beach that was unique, which came out in this case, is it's always been a residential town. No, but I understand that. But I mean, you're not saying that nobody's ever used the dry beach, dry sand beach other than the beachfront property owners, are you? No, you're right. The town has purchased a beachfront lot, which they opened to the residents, which is right next to the Moore's home. And so the town went out, used money, bought a lot, just like my clients, and opened it up to the residents of the town. In addition, there are lateral accesses that allow people to get out to the foreshore that are in reserve to the owners of the platted subdivisions, including but not limited to people who are in those subdivisions. The town says those are town accesses, but they're reserved to the residents of the owners of homes in the plat. But those are only lateral accesses to the foreshore. And so the town, like my clients, went out and purchased a lot on the water, and they allowed the public to use that. Notably, you have to be a resident and get a parking resident parking pass from the town to use that beach park. And so, yes, are there people that go out to the beach in Reddington Beach? The answer is yes. And in fact, when they were asked to produce what evidence they had concerning the use of the dry sand area in Reddington Beach, generally, they produced pictures of people at Beach Park. And in one limited instance of the house or the property immediately north of Beach Park, but those pictures, the town representative admitted the owner of that house was in the picture, strongly suggesting a permissive occupation. Let me ask you about that, because I will say, I mean, to me, the district court summary judgment decision here reads like fact findings after a bench trial. And the argument that you just made sort of reads like fact findings after a bench trial. I mean, isn't, wouldn't it, I mean, we've got an expert saying as a historical matter, the public had access to these areas. We've got pictures, which may not be sort of irrefutable proof that they're public on these areas, but could you could reasonably infer that there was public access to these areas. And we've got some basically some old residents of the town saying that they've always used these areas. Isn't that enough to just get past the summary judgment hurdle and have a bench trial on the issue of customary use? Why is it not? I would simply say, number one, the town's not even claiming material issues of fact preclude summary judgment. In this case, I would say this. We need to talk about what you mean when you say these areas, because Dr. evidence of people walking up and down the foreshore swimming in the Gulf of Mexico fishing from the foreshore is no evidence of a ancient historical uninterrupted, not contrary to law, long standing use of the private upland property, which is the only property that's an issue in this case. In fact, I mean, so what kind of evidence and you may be right about that. I just like what kind of evidence, would a town produce, if not sort of old people talking about using the land pictures of people in sort of the general areas, and a historian talking about like the general area and how it's used like how could a town, even do this. Well, I would note that the cases where it has been found, particularly over in Volusia County, there was literally a path where the vehicles drove, and they could document exactly where the vehicular traffic repeatedly was allowed to occur in that local area. So when we're talking about a local custom. Number one, the law is clear, you can have a custom that runs in favor of the public at large, or otherwise that's just the common law. Number two, in the cases in Tonorama, there was a specific tourist attraction, the pier out of Daytona, where there was a needle and there was a place where tourists and the public gathered there. It was kind of like the Boston Commons, it was a specific place, everybody in the community knew. And the Trepannier Court cited by Judge Moody was that if there's such a ubiquitous use of a parcel for a specific purpose by a specific group of people, then you would be able to produce some evidence of it. And here the town was asked repeatedly, what evidence do you have? In fact, the week they passed the ordinance, I made a public records request, send me all the evidence you had, and we received 10 photographs, mostly of people on the town's land, each part. And so none of the evidence they produced would go to this level of establishing this longtime historical use, time immemorial of the upland. And to put a finer point on it, their own expert acknowledged that Florida is a mean high water state, has been since the commencement of the state. When Spain ceded Florida to the United States, it was mean high water. When it was a territory, it was mean high water. When it became a state, it was mean high water. We enshrined that in our constitution. And we also enshrined in our constitution, one of the primary things of our state constitution, is public property rights, Article 1, Section 2. And so we give primacy to private property rights in the state. And there are recording statutes that document how people establish and put the public on notice of their interest in land. And so I've got a question about your takings claim. What are your clients seeking in terms of relief besides the invalidation of the ordinance and the inability going forward of the public to be on their land? Yes, so what the district court did, which is what we saw, was saying the statute was invalid because the town kept it in effect after July 1st of 18. What he found was that between the date of the passage of the ordinance, June 6th of 18, and the date he invalidated it, there was a temporary taking. But obviously, once he invalidated the ordinance, it no longer had operation. So the taking was not continuous. So the taking that occurred in this case was temporary. It was during a period of time where law enforcement was told not to enforce trespassing laws, when the town was telling people, come to these people's land. Now that that's been invalidated, that ordinance no longer operates as a taking. And so the damage… Right, but are you seeking, yeah, what damages are you seeking for the time period when the ordinance was in effect? Yes, so after the district judge found this temporary taking, the party stipulated to, I believe, $10,000 per family as the temporary takings damages to avoid the expense of a trial on damages so we could get to the liability issue here. So it was a very small award for the two years, essentially, that the town had invited and announced that this was public land. And so… Any meaning to the words, you know, does not deprive a government entity from raising customary uses and affirmative defense in any proceeding challenging an order, ordinance, or rule adopted before July 1, 2018? Absolutely, it does. So here's how we believe the statute should be harmonized and is intended to operate. The legislature's primary goal in this statute was to give due process to property owners so that municipal governments and counties could not just declare a right of people on their land. That's the whole purpose of the statute is about due process. And so what they did was they said, you can't keep one in effect unless you have a judicial declaration in your hand, showing that you gave the property owner due process. And they knew they would be invalidating ordinances between 2016 and 2018. And because they knew they were invalidating ordinances… Well, because that's where Section 4 comes in. They wanted to make sure that those governments could still defend takings liability on the basis that there was customary use in fact. And that's what we believe Section 4 preserves the affirmative defense for governments that had adopted an ordinance during that period of time that would be invalidated by the keeping in effect language. They wanted to preserve to those governments an affirmative defense to damages liability. It doesn't say that, does it? It says in any proceeding. It doesn't limit it to damages proceedings or takings proceedings. Correct. So there was a progress, of course, obviously, in the legislative process. But initially, the legislation was just Section 2. And then Section 4 is added precisely because there was a raging debate going on in Walton County about an ordinance that county had adopted after 2016. In fact, one might argue this is what this legislation was written for. So to make sure that if a municipality had adopted one during this period, and it was going to be invalidated as of July 1st of 2018, they did not want governments being automatically subjected to taking liability. Basically, you're talking intent of the legislature, legislators and passivists. I think that's the logical way to harmonize the two provisions, because otherwise the town would have you read out the keep in effect language completely. Can I follow up on Judge Brasher's observation about this district court order kind of sounding like findings of fact? One of the things that strikes me about this is some of your clients are unhappy about things that went on before the ordinance was passed. I'm talking about Ms. Moore. I mean, she said that certain trespassing within the 15-foot buffer identifying the ordinance went on before the ordinance was ever passed. And she just said, well, the ordinance invites more people to do that, even though the ordinance says you can't do that. So, I mean, it seems like the district court waded into a pretty fact-intensive inquiry on summary judgment. I don't think he did, because he looked at the elements of customary use. And this is not something you can just say, well, somebody anecdotally said when they were a kid, they rode their bike on the beach. First off, you don't ride your bike in the thick sand upland. You ride your bike on the firm sand on the shore. So, each piece of evidence that the town advanced forward was either so loose or so unexplained, or at best, I mean, their own experts said, I have no information of anybody using property above Mean High Water in Reddington Beach. In that same vein, I mean, where in the record, I think you've taken the position that traffic increased after the ordinance was passed. I mean, where is that in the record? I mean, and, you know, is it quantified or how much it increased? Yeah, I would say it's not quantified, but I really think that really goes more to the issue of damages. What the district court found was when you allow a physical occupation of another's land, that's a per se taking. And so we're not getting into the sort of investment-backed expectations realm or anything like that. You literally authorized an occupation of these folks' lands. And I would just note that the town corporate representative was asked, what evidence do you have on customary use? Nothing. And the same thing with the Wendy Fields First Amendment retaliation. Nothing. And that's what their experts said. Nothing. And the fact that the mayor remembers riding a bike on a beach, he also testified he worked at the Tides Bath Club, which was private, and it was my job to exclude other people from the cabanas and the chairs. And so this is, from our perspective, a land grab. The district court correctly recognized that because Florida has a law that sets the boundary at Mean High Water. Thank you very much. Can I ask, I mean, that was a great wrap up, but if I could ask another question, too, because you mentioned the Wendy Fields issue. So, you know, I guess how, upon the balancing test that the Supreme Court said we have to apply to a speech claim like this, how is it not justifiable for the government to say, look, you're on a board that deals with zoning and you are disputing like a huge land grab issue from the town. We don't want you on that zoning board anymore because, you know, you're basically contesting the propriety of one of our ordinances. I mean, if you, it just seems to me like if you apply the Pickering balancing test, you would say that makes sense that the government has an interest there in getting someone off a zoning related board because she's doing that. What do you say about that? I think under Pickering, that would be a very slippery slope to say that a person who is clearly speaking about a private matter is private to them, their property, which is a matter of public concern in the town, that they would be disqualified from sitting in those office positions for being an employee. To me, I think that's a terribly slippery slope under the First Amendment to say, because otherwise it's justified. Is it that they would be disqualified from sitting in that office or really the point is that they would be disqualified from making zoning decisions that would directly benefit themselves. So the Board of Adjustment grants variances in the town, and this customary use issue has nothing to do with variances or the criteria for variances to apply on that board. And no one on that board could impact or affect anything having to do with this customary use. She volunteers to decide whether or not her neighbors and people in the community are entitled to get a variance from hardships in the town's code. And unlike the McKinley case relied on by the town, her matters of speech of public concern had no relationship to her office. They were not done at the commission meetings or done in a manner to disrupt any function of government that she was involved in. And if we allow towns to retaliate against citizens for merely questioning that, I think we're in a very dangerous space. And here's the here's the issue that I have. And, you know, I think you're right about that to a certain extent. But this is not a person who's like a firefighter or a police officer or, you know, just someone who works for the town who's suing the town. This is someone who's on the zoning board suing the town over a zoning ordinance. I mean, it strikes me as it's kind of similar to like a town police chief suing the town over some kind of policing policy or some kind of policy that affects the police. I guess. So could you just kind of focus up on that? I mean, isn't she in the position of making policy about land use for the town? So the Board of Adjustments has no authority over zoning. They just grant exceptions to provisions of the zoning code, which are a whole separate set of criteria. So there's a five criteria to get a variance. And so it's not setting the policy of how we're zoning in the town or what we're allowing to occur on private property. To me, they're totally disconnected issues and she never connected them. And there was no evidence that they were ever connected to her public service. And I think that's undisputed. In fact, someone just says, well, how can you allow her to be on the board when she's filed the lawsuit? And that was literally the justification the town offered was somebody complained to that, which is essentially giving somebody at the grocery store a heckler's veto over Wendy Field speech. Well, one final question. What do you think about certifying the state law issue to the Florida Supreme Court? So I disagree that we need to decide whether the ordinance is valid to determine the Fifth Amendment issue precisely because Judge Moody said I'm invalidating the ordinance. And I'm only finding the taking during this limited two year period here. So we're not talking about a permanent taking case here. The court, it's up to your discretion as to whether or not to certify what 163 035 means. I understand that it's a fairly new statute, but I would simply suggest that Judge Moody was able to read it and harmonize it. I think this court can read it and harmonize it. Only the town's version allows you to take keep in effect completely out of the statute. And so to give effect to both, you can't keep the ordinance past July 1st of 18, but we're going to give you a defense for the fact that you ever had one. And that's a simple way to harmonize the two provisions. Mr. Eschenfelder. Your Honors, I want to talk about, first of all, we really need to understand this is not a land grab. The application of customary use is already in place. Look at the tone of the decision. The court merely recognized that which was already burdening the land that was owned in that case. The town's ordinance merely recognizes the same thing. If you read the ordinance, it creates no new obligation on the part of anyone. The opposing counsel says that the town's ordinance invited people and compelled people to come. No, it didn't. What it responded to is the fact that these newer folks that have a lot of wealth and have purchased these beachfront properties are now going into their backyards and saying, get off my property. And the old community in the town who live inland who are doing what they've always done are coming to the town commissioners and saying, wait a minute, what is going on here we've always been able to do this. If you look at the ordinance, it says you can traverse the beach, sit on the sand, use a beach umbrella of less than seven feet Sunday picnic fish or swim. And so, all of this stuff that they're complaining about with respect to public urination damage of property holding weddings. The ordinance doesn't create any of that. It has nothing to do with that and as you several of you pointed out, that kind of stuff was occurring before him so so really truly this was the fact that the town recognize customary use if anything, the ordinance creates the 15 foot buffer from the toe of the dune, which actually gives the homeowners more of a break from whatever impact folks using it and they had before because theoretically they could go all the way up to the toe of the dune. So, then I want to touch briefly on the ancient issue. The place would have you go all the way back to, to British kings to try to figure out how this beach was used, but as the trading airport world. And it's no 22 interviews is an awkward concept in a new world society. And when you look at the only case that I can find it for that really talked about the time period, it's the tone of Rama case and the tone of Rama case, the Court of Appeals opinion which of course is part of the record said it examined back 20 years, it only looked at 20 years of the records, take a look. Our expert look at way farther back than 20 years. I want to in the two minutes that I have left because I get the opportunity to talk briefly about the first issue. And so again, in this particular case, if you look at the exchange that occurred at the town commission meeting. This began to be discussed because commissioners had been approached by folks in town at the grocery store saying you know what's up with this field. This fields participated in the discussion of that meeting. This feels this feels offered luck if y'all feel that, you know, I'm not really welcome anymore. I will be perfectly fine with resigning the commission hold themselves and said yeah you really think that you should, and she accepted that it was only after she went back and phoned her attorney and her attorney said, wait a minute, don't do that because I got a first claim I can add that she then says I want to kind of undo my resignation. But so, so our first point is that really if you look at the 11th Amendment case law and the Florida case law on public official recognitions being effective immediately upon submission resigned she willingly left your seat, but even if she is that is that is that a legal question that we would look at or would we have to overturn a factual decision made by the district court on that. Well I think that the appellate courts before have have looked at it in the employment law context that looked at what an employee doesn't says at a meeting with his or her employer, and the words that they say and have legally concluded that those words constitute a resignation so I believe that this court can based upon the record including this field's own admissions at that position, include that she resigned, but even if she didn't resign as Judge Brash was indicating this isn't a case of a lower employee, where the dynamic is probably going to be different under Pickering is looking at a public official, and you know how is it that the county gets to in McKinley versus Kaplan case that is this court's case, how is it that they can take a member of their film criticized a decision that the county commission made on funding and music festival which had nothing to do with the film boards jurisdiction in Dane County, how can they remove that person because she's out there criticizing that decision because of Cuba politics, when in this case, the town commissioners are hearing concerns about Miss fields on a Board of Adjustment where the record confirms Board of Adjustment votes are final they are not appealable to the county to the to the city commission only on tertiary in the Court of Appeals. And so therefore, her vote means even more. Thank you. Thank you. We have your case.